UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


| | | |
|---|---|---|
| SHARON ELIZABETH AVERY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:04-CV-312 |
| | ) | (Guyton) |
| IDLEAIRE TECHNOLOGIES | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |


**MEMORANDUM AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the

Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings,

including entry of judgment.  [Doc. 40].


**I.**        **Introduction**

This is a discrimination and retaliation action brought by the plaintiff Sharon Avery

("Avery") against her former employer, IdleAire Technologies Corporation ("IdleAire").

Specifically, the plaintiff asserts causes of action under Title VII of the Civil Rights Act of 1964,

as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII");  the Equal Pay Act, 29 U.S.C. § 206(d); and

the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA") for sexual

harassment, gender discrimination, pay equity discrimination, age discrimination, failure to promote,

hostile work environment harassment, and retaliation.  Additionally, the plaintiff asserts claims of

outrageous conduct and negligent infliction of emotional distress under Tennessee state law. [Doc. 1].

IdleAire admits that it is an "employer" within the meaning of the various federal statutes under which the plaintiff brings this action; that the plaintiff filed a charge with the EEOC; and further, that the EEOC issued the plaintiff a Notice of Right to Sue on April 28, 2004. The subject matter jurisdiction of the Court is not in dispute. [Doc. 7].

After carefully considering the entire record, the Court concludes that summary judgment in favor of IdleAire is proper with respect to the plaintiff's failure to promote claims, her claims that she was terminated due to her age and gender, and her state law claims for outrageous conduct and negligent infliction of emotional distress. For the reasons that follow, the Court finds that there are genuine issues of material fact which preclude summary judgment with respect to the plaintiff's hostile work environment claim and her retaliation claim. Accordingly, the defendant's Motion for Summary Judgment [Doc. 80] is **GRANTED IN PART** and **DENIED IN PART**.


II.        <u>**Relevant Facts**</u>

As required by Rule 56 of the Federal Rules of Civil Procedure, the Court will recite and consider the relevant facts in the light most favorable to the plaintiff. In doing so, the Court relies on the depositions of the plaintiff and several IdleAire employees, as well as other testimony and exhibits filed with the Court.

A.        <u>**IdleAire's Business**</u>

IdleAire is a Tennessee corporation formed in 2000, with its headquarters located in Knoxville, Tennessee. IdleAire has developed a product and service referred to as "advanced travel

center electrification." This service is installed in truck stops and travel centers and provides electrical power, air conditioning, and an array of other services to the cabs of parked diesel-powered trucks, enabling drivers to turn off their engines while parked for extended periods of time. Use of IdleAire's service eliminates the need for continuous and extended idling, thereby providing an environmental benefit, as well as a fuel savings for truck operators. [Crabtree Dec. ¶3].

IdleAire offers its services out of travel centers, fleet terminals, and distribution centers with which it has a contract. IdleAire's technology is in high demand and has expanded to over 29 states across the country. At present, IdleAire operates out of at least 107 locations, including the Watt Road travel center in West Knox County, Tennessee, where the plaintiff was employed. IdleAire opened the Watt Road location at Petro's Stopping Center in July, 2002. [Id. at ¶4].

IdleAire employees are located at every travel center where IdleAire operates. IdleAire employs Site Representatives to handle selling the service to truck drivers, hooking up the IdleAire technology to the customer's truck, cleaning the equipment after use, and monitoring the lot for any technical problems. Each location has several employees on shift at all times, and each facility is open twenty-four hours a day. [Id. at ¶5].

**B.** **Plaintiff's Employment with IdleAire**

The plaintiff was hired as a full-time Site Representative in October 2002 at IdleAire's Watt Road location. [Avery Dep. at 24; Patterson Dec. at ¶2]. As a Site Representative, the plaintiff was responsible for selling IdleAire services to truck drivers, hooking up customers to IdleAire service, accepting payment, keeping records of sales and service, and performing other duties related to IdleAire's operation. [Pattern Dec. at ¶2].

The plaintiff requested to transition into a part-time position with IdleAire in November 2002 in order to accept full-time work elsewhere. IdleAire consented to the plaintiff's request, and the plaintiff continued to work part-time at IdleAire while she worked full-time for another company until February, 2003. At that time, the plaintiff returned to full-time employment with IdleAire. [Avery Dep. at 24-25, 217-18; Ex. 12].

In June 2003, the plaintiff was promoted to Shift Leader, a position one level below site supervisor. In this position she continued to perform the duties of a Site Representative, but with added supervisory responsibilities, particularly at times when the Site Supervisor was absent from the site. She continued in this position until she was terminated on September 12, 2003. [Patterson Dec. at ¶3]. At the time of her termination, the plaintiff was more than forty (40) years old.

C.      **Plaintiff's Application for Site Supervisor Position**

In early 2003, the Site Supervisor position at the Watt Road facility became available. The Site Supervisor's responsibilities included providing on-site management, staffing, training, parts and supply inventory, expense and control, public relations, and support of the IdleAire system. Additionally, the Site Supervisor was charged with providing on-site support and service to the professional truck drivers using IdleAire's services. [Hunt Dec. at ¶4]. Promotion decisions related to this particular Site Supervisor position were made by Gerry Cooksey ("Cooksey"), Director of Training; Bill Buzbee ("Buzbee"), then Vice-President of Operations; and Steve Hunt ("Hunt"), Area Sales Manager. [Hunt Dec. at ¶¶2, 3, 4].

Per IdleAire's standard procedure, the Site Supervisor position was posted on the IdleAire intranet (a company internal communication system), and interested employees were

invited to apply. Five IdleAire employees, including the plaintiff and another employee by the name of Eric Patterson ("Patterson"), applied for the vacant Site Supervisor position after the vacancy was posted. The applicants were interviewed by Buzbee, Cooksey, and Hunt. They used a structured interview process that required each applicant to answer the same predetermined questions. [Hunt Dec. at ¶5]. Patterson was promoted to the Site Supervisor position on February 11, 2003. [Patterson Dec. at ¶¶1, 4].

At the time that she applied for the Site Supervisor position, the plaintiff was a part-time employee. [Avery Dep. at 24-25]. She held a certificate of completion from the Lee School of Business in Universal City, Texas. She had previous work experience in the trucking industry, including being an over-the-road truck driver. [Avery Dep. at 5, 6, 29]. The plaintiff had also been a secretary, EEO officer, and payroll officer for a company called Milbourn Construction from 1991 to 1993. The plaintiff and her husband also owned their own business, Franklin & Howell, from 1993 through 1998, a business which had approximately 20 to 25 employees. The plaintiff and her husband also had previously owned a small trucking company called A&A Trucking. [Avery Dep. at 28-35].

Patterson, who was born on February 21, 1964, had been employed as a full-time employee at IdleAire since July 2002 and was one of the initial employees hired for the Watt Road location. Prior to working at IdleAire, Patterson had worked as an Area Manager for U.S. Cellular for approximately one year, a store manager for Dick's Sporting Goods for approximately one year, and as a manager for Toys R Us/Babies R Us in California and other states for seven years. [Patterson Dec. at ¶5]. From November 2002 until February 2003, Patterson worked as a Site Representative and as a fill-in Shift Leader, primarily for the third shift. IdleAire's third shift was

the site's busiest, because truck drivers frequently stopped at the Watt Road location to park and sleep during that shift. On shifts when Patterson served as the fill-in Shift Leader, he performed all of the duties required by the position. [Id. at ¶6].

According to Cooksey, IdleAire's Director of Training, Patterson's interview performance, past work experience, and performance with IdleAire were deemed the best of all the applicants who applied for the position. Patterson was able to demonstrate an excellent knowledge of management, possessed better communication skills than the other applicants, and had impressive experience and qualifications related to the position. [Cooksey Dec. at ¶4]. Hunt, IdleAire's Area Sales Manager, testified that he believed those traits to be essential to the Site Supervisor position. [Hunt Dec. at ¶7].

## D.    Plaintiff's Application for Area Sales Manager

The position of Area Sales Manager for IdleAire's Texas market opened for application in August 2003. [Avery Dep. at 152]. An Area Sales Manager is responsible for managing multiple sites in the area. In 2003, IdleAire had multiple sites in Texas, which were managed by the Area Sales Manager for IdleAire's Texas market. [Patterson Dec. at ¶7].

The plaintiff submitted an application for the Texas Area Sales Manager position on September 4, 2003. [Avery Dep. at 154]. At the time that she applied for the position, she was employed as a Shift Leader, a position two levels below an Area Sales Manager. [Patterson Dec. at ¶8]. The plaintiff testified that Patterson had told her, prior to applications being accepted in September, that James Abernathy ("Abernathy") would be the one to get the Texas position. [Avery Dep. at 156].

After the plaintiff applied for the Texas Area Sales Manager position, Patterson showed her resume to other employees and made fun of the plaintiff's attempts at seeking a promotion. [Avery Dep. at 107]. Patterson specifically made comments about the plaintiff such as, "Her be a district manager? Ha!" [Stilwell-Clemons Dep. at 29-30]. Patterson received a verbal reprimand for this conduct. [Patterson Dep. at 22-23].

Buzbee and Cooksey were the decisionmakers responsible for selecting the successful candidate for the Texas Area Sales Manager position. [Cooksey Dec. at ¶5]. Abernathy was awarded the Texas Area Sales Manager position. [Avery Dep. at 152]. At the time that he applied for the position, Abernathy was the Site Supervisor at IdleAire's Atlanta location, the highest grossing IdleAire facility at the time. According to a declaration filed by Cooksey, Abernathy's leadership and management skills were considered instrumental in the success and profitability of the Atlanta location that he managed. [Cooksey Dec. at ¶6]. Cooksey further testified that Abernathy's experience, the success of the Atlanta location, his experience in managing new site, and his interview performance led the decisionmakers to conclude that he was the best choice for the position. [Id.].

E.    **Plaintiff's Hostile Work Environment Complaints**

1.    **Pornography At The Workplace**

IdleAire's Watt Road location had only one computer for all employees to share. While each employee had access to the computer, only those employees with a need were supposed to use the computer. According to Patterson, that meant each Site Representative clocked in and clocked out on the computer each day, but had no other business reason to access the computer. Absent unusual circumstances involving site operations, only the Area Sales Manager, Site

Supervisor, and Shift Leader had a need to use the computer for any reason other than to clock in and clock out. [Patterson Dec. at ¶13].

While clocking in, the plaintiff observed pornographic pop-ups on the computer screen. The plaintiff testified that this occurred multiple times and that she began to see a pattern where it would happen more often after certain male employees had worked. [Avery Dep. at 121, 122]. The plaintiff testified that she observed pornographic pop-ups on the computer screen approximately less than 25% of the time that she clocked in and clocked out from the beginning of her employment until May 2003. [Avery Dep. at 123, 134]. The plaintiff testified that she saw much more pornography on the company computer after becoming Shift Leader because she used the computer more. [Avery Dep. at 70-71, 118]. She testified that from May 2003 until her termination in September 2003, she saw adult-related pop-ups approximately thirty percent of the time that she used the computer. [Id.]. The pop-ups could be removed by clicking on the "X" located at the top of the pop-up box. The plaintiff estimated that this process took about fifteen seconds to complete. [Id. at 73-74]. The plaintiff attached several examples of the pornography that she viewed on the company computer as exhibits to her complaint. [Doc. 1, Attachments].

The plaintiff testified that she had complained about the pop-ups "over the months" but that nothing had ever been done. Specifically, she testified that she complained to her supervisors, Patterson and Hunt, as well as to Paul Boyd, the Vice-President of Finance (who also served as IdleAire's human resources person), and Claude Ramer, the defendant's attorney. The plaintiff testified that Boyd advised her that if she did not like the conditions at IdleAire that she could leave. [Avery Dep. at 111, 113]. The plaintiff never saw a decrease in the pornography after making complaints. [Id. at 137].

In July 2003, the plaintiff talked to Patterson about the adult-related pop-ups appearing on the computer. [Avery Dep. at 126-27]. After this discussion, Patterson contacted the IdleAire Information Technology ("IT") Department. [Patterson Dec. at ¶14]. Greg Stooksbury, a member of the IT Department, visited IdleAire's Watt Road location within two days of the plaintiff's complaint and worked on the computer. Patterson states in his declaration that as a result of Stooksbury's actions, the number of adult-related pop-ups decreased significantly. [Id.]. The plaintiff testified that to her knowledge, the IT Department became involved not because of her complaints but because one of IdleAire's employee crashed the computer system by looking at pornography. [Avery Dep. at 137].

The computer's internet history indicates that pornographic websites were visited by other employees. In August 2003, the plaintiff voluntarily reviewed the history of websites visited by other IdleAire employees on the Watt Road computer. These websites depicted nudity and sexually explicit activity. She made copies of the adult-related pop-ups and pornographic websites that she observed in the computer's internet history. [Avery Dep. at 69-70, 135-37]. Avery testified that she printed off some of the websites in front of Jeremy White ("White"), who was the Shift Leader in charge of the plaintiff's shift. When the plaintiff told White that the pornography needed to stop, White just laughed. [Avery Dep. at 72-73].

While the plaintiff did not ever observe a pornographic web site left on the computer screen, she did on one occasion see two pornographic pictures printed out and laying near the computer. [Avery Dep. at 133]. The plaintiff asked other employees who were present where the pictures had come from, and the employees advised the plaintiff that the Shift Leader at the time, Keith Pratt, had printed them. [Id.].

Lydia Baker, a Petro's employee at the Watt Road location, was also aware of the pornography. She found computer printouts of pornographic scenes laying on a shelf in the janitor's closet when she went to check on supplies. [Baker Aff. at ¶2].

Other employees, including Karen Stilwell-Clemons, Paul Clemons, and Spencer Cobb, were offended by the pornography and complained about it as well. [Stilwell-Clemons Dep. at 93; Paul Clemons Dep. at 17; Cobb Aff. at ¶3].[1] Stilwell-Clemons testified that the pornography was an everyday occurrence. She and another IdleAire employee, Lisa Hill, also found printouts of pornography left in the office. Stilwell-Clemons testified that one employee, Ron Wilson, stated that he got so bored on first shift that he did not see anything wrong with going to pornography sites. Patterson and Hunt were both aware of what Wilson was doing, but he was not disciplined. [Stilwell-Clemons Dep. at 41]. When Stilwell-Clemons complained about the pornography, management told her that they were aware of it and that they were working on it. [Id. at 43].

Charles Spencer Cobb ("Cobb"), a former employee of IdleAire, testified by affidavit that he also saw the pornography, and that when he reported it to Hunt, the Area Manager, Hunt's response was "oh well, that happens." [Cobb Aff. at ¶3]. Cobb further testified that Abernathy carried pornography in a golf bag in the back of his car, and that he brought pornography to the work

---

[1]In her brief, the plaintiff relies upon a purported e-mail from Benjamin Lusk to David Everhart, dated September 10, 2003 to support her contention that other employees complained about pornography and were able to meet with IdleAire's Chief Operating Officer, David Everhart, about the issue. However, this e-mail is not authenticated by any affidavit or declaration, nor does it appear to be an exhibit to any deposition taken in this case. As such, this e-mail, in its current form, is hearsay that will not be considered by the Court. See Little v. BP Exploration & Oil Co., 265 F.3d 357, 363 n.3 (6th Cir. 2001) (concluding that it was proper to disregard a letter submitted in opposition to a motion for summary judgment where letter was not offered through sworn testimony as being true and correct).

site and showed it to other employees. [Id. at ¶1].  Cobb testified that this pornography interfered with his ability to do his work. [Id. at ¶¶2, 7].

IdleAire denies that it did nothing to stop the viewing of pornographic websites by its employees.  Patterson testified that IdleAire terminated an employee for improperly using the computer in February 2003, but that the pop-ups continued to be a problem after his termination. [Patterson Dep at 110-11].  The problem was eventually resolved in September or October, 2003, when the company's computer was replaced.  [Stilwell-Clemons Dep. at 93; Patterson Dep. at 120-22].

2.    **Derogatory and Harassing Comments**

Ronald Shoupe, an IdleAire employee, observed other employees talk about females and use sexually harassing language.  He testified that male employees were encouraged to make inappropriate comments about females in general. [Shoupe Aff. at ¶7].

Cobb testified that IdleAire management referred to the plaintiff as a "bitch."  He further testified that Hunt and Patterson made fun of the plaintiff to other employees for applying for promotions; that they made derogatory comments about her experience, education, and where she lived; and that both men made the statement, "did she think she could push her way in here?" [Cobb Aff. at ¶16].  Patterson even told Cobb that he was going to get rid of the plaintiff. [Id. at ¶25]. Cobb found Patterson's comments about the plaintiff to be demeaning and inappropriate, and he observed the plaintiff to be well-groomed, professional, and polite. [Id. at ¶¶ 28. 29].

The plaintiff testified that Hunt would diminish, intimidate, and humiliate her by making comments about her nail polish and hair, by calling her a "bitch" to other employees, and by taking credit for ideas that she had proposed to him. [Avery Dep. at 103].

Lydia Baker testified that Patterson told her that the plaintiff could make more money "in the trucks" (*i.e.*, by being a prostitute) than she made at IdleAire. Baker further testified that Patterson referred to the plaintiff as a "slut," and that she overheard him making fun of her make-up and perfume. Patterson also told Baker that the plaintiff was more trouble than she was worth. [Baker Aff. at 9, 10].

The plaintiff received a copy of IdleAire's employee handbook when she was hired by IdleAire and signed an acknowledgment form indicating that she had received it. [Avery Dep. at 23-24, Ex. 9]. The handbook contained a "Sexual and Other Unlawful Harassment" policy, which stated as follows:

> IdleAire is committed to providing a work environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive, or disruptive, including sexual harassment. Actions, words, jokes, or comments based on an individual's sex . . . or any other legally protected characteristic will not be tolerated.
>
> \*       \*       \*
>
> If you experience or witness sexual or other unlawful harassment in the workplace, report it immediately to your supervisor. If the supervisor is unavailable or you believe it would be inappropriate to contact that person, you should immediately contact the General Counsel. You can raise concerns and make reports without fear of reprisal or retaliation.
>
> \*       \*       \*
>
> Any supervisor or manager who becomes aware of possible sexual or other unlawful harassment must immediately advise the General Counsel so it can be investigated in a timely and confidential manner. Anyone engaging in sexual or other unlawful harassment will be subject to disciplinary action, up to and including termination of employment.

[Avery Dep. Ex. 1 at 37-38]. The plaintiff read the handbook and was aware of its contents. [Avery Dep. at 124].

The plaintiff did not complain to Jim Price, General Counsel for IdleAire, about Hunt's and Patterson's conduct as required by the Employee Handbook. She testified that it was her understanding from Hunt and Patterson that IdleAire employees were not to call the General Counsel for any reason. She also testified that "anytime you would complain, per what I viewed or understood, it was not good. I mean, there was an intimidation factor." [Avery Dep. at 125-26]. After the plaintiff's complaints of pornography on the computer were ignored, the plaintiff began to make arrangements to take her concerns to upper management, particularly the company's Chief Operating Officer, David Everhart. [Avery Dep. at 106-07, 125, 195].[2]

### 3. Other Incidents

The plaintiff identified several other incidents which she alleges contributed to a hostile working environment. On one occasion, one of the plaintiff's co-workers displayed a picture of a van with an IdleAire unit attached to it with a superimposed headline which read: "IdleAire's New and Improved Slogan." Beneath the headline read as follows:

> The Knoxville locality at Watt [R]oad called a conference consisting of people who have no say-so in the company. We have decided to have a slogan that no one will take seriously because no one ever takes us seriously.

---

[2]The plaintiff contends that "[o]n August 25, 2003, at 8:58 p.m.," she "called David Everhart to complain about the inappropriate working conditions." [Doc. 98 at 8]. However, the plaintiff does not offer a record citation for this assertion. Further, while she states that she left "her name and number" with Everhart, she relies only upon her Complaint in support of this claim. [Id.]. When a motion for summary judgment is made, the plaintiff may not rest upon the mere allegations of her complaint, but must set forth, by affidavit or otherwise, "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Accordingly, the Court finds that the plaintiff's citation to her complaint is insufficient to establish this contention as a fact to be considered in evaluating the defendant's motion.

Under the picture of the van was a slogan which read, "Give us a Hole, And we'll fill it with our unit." [Patterson Dep. Ex. 1]. On another occasion, an IdleAire employee constructed a snowman with male private parts outside of the office where customers could see it. [Stilwell-Clemons Dep. at 5, 50-51]. Stilwell-Clemons testified that Patterson directed the employee to remove the snowman once Patterson learned about it. [Id. at 5]. There is no evidence in the record that the plaintiff personally observed the snowman.

Another factor that the plaintiff alleges contributed to the hostile working environment was the fact that IdleAire had hired two women whom the plaintiff alleges were rumored among IdleAire's customers to be prostitutes, or "lot lizards." When other female employees complained about the hiring of these employees, Hunt and Patterson advised that their numbers were excellent and that they were some of the best workers that IdleAire had. [Stilwell-Clemons Dep. at 54-56]; In yet another incident, the plaintiff alleges that a male IdleAire employee threw a radio at a truck and became physically confrontational with a driver, all without being disciplined. [Stillwell Clemmons Dep. at 68].

The plaintiff testified at her deposition that as a result of the work environment at IdleAire and her subsequent termination, she experienced weight loss, hair loss, and problems with her short-term memory and concentration. [Avery Dep. at 205].

F.     **Plaintiff's Claims of Age and Gender Discrimination**

The plaintiff testified that while employed at IdleAire, she observed that most promotions were given to men under the age of forty. She further testified that she observed favoritism toward the male employees, especially the younger males. [Avery Dep. at 83, 84].

Specifically, she testified that Cobb, a male IdleAire employee over the age of forty, was referred to as the "old man." [Avery Dep. at 91, 93].

The plaintiff also complains that when she was promoted to Shift Leader, she was not given a password, or sign on, and had to borrow from other employees to do her job. Although she requested a sign on in April, she received no response. She finally received a password in July after sending another email request. [Avery Dep. at 110].

The plaintiff claims that she received no support from her supervisor, Patterson. Specifically, she testified that he would ignore the plaintiff and not answer her phone calls. When she was promoted to Shift Leader, she requested to keep her same nights off, Friday and Saturday, but Patterson refused, citing that a recently hired male employee already had those nights off and that "he had a son." The plaintiff asked what difference that made as she had a daughter and had seniority. The plaintiff was required to change her days off. [Avery Dep. at 116, 117].

Karen Stilwell-Clemons testified that after the plaintiff applied for the position of Area Sales Manager, Patterson "did not like her." Patterson was also Stilwell-Clemons' supervisor until he was promoted. She testified that Patterson also treated her poorly, often singling her out and yelling and swearing at her in meetings. [Id. at 26]. Stilwell-Clemons testified that she had applied for numerous positions for which men were promoted or hired, including Site Supervisor, Operations Specialist, and Job Site Supervisor. [Stilwell-Clemons at 9-13]. According to Stilwell-Clemons, no female had been promoted to Site Supervisor in the entire district area, which included Tennessee, Kentucky, North Carolina, and at one point, Atlanta. [Id. at 14, 16]. It was her

perception that people were promoted who did not deserve to be. Specifically, she felt that the more an employee "screwed up," the more he was promoted. [Stilwell-Clemons Dep. at 94].[3]

Ronald Shoupe, a 46-year-old IdleAire employee, testified that from his observations, IdleAire discriminates against employees based on their age and gender, and he believes that the plaintiff was subjected to sexual harassment. Shoupe observed that younger employees with less experience than he or the plaintiff made more money, and that IdleAire would hire women who looked good and could sign up truckers for IdleAire's services. [Shoupe Aff. at ¶¶ 1, 8].

G.    **Events Leading to Plaintiff's Termination**

According to Patterson, one of the reasons for the plaintiff's termination was her inability to get along with a number of co-workers during her employment with IdleAire. When the plaintiff became a Shift Leader in June 2003, Patterson received complaints from her subordinates about problems with the plaintiff's interpersonal skills. Specifically, the plaintiff had continuous problems with Ken West, a Site Representative who typically reported to the plaintiff. Patterson verbally counseled the plaintiff several times about problems with her staff, but the problems persisted. [Patterson Dec. at ¶15].

Another stated reason for the plaintiff's termination was an incident in September 2003, wherein IdleAire claims that the plaintiff complained to Lydia Baker, an Assistant Manager at Petro's, about two IdleAire employees who changed clothes at the end of their shift in the Petro's ladies restroom. [Crabree Dec. at ¶9]. IdleAire's position is that to the extent that a problem existed,

_____

[3]The plaintiff contends in her brief that Stilwell-Clemons "heard from other employees, that Eric Patterson made it known that Plaintiff would never be promoted." [Doc. 98 at 18]. This assertion, however, is based entirely upon inadmissible hearsay, and therefore, the Court will not consider it. See Jacklyn v. Schering-Plough Healthcare Products Sales Corp., 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment.").

the plaintiff should have notified IdleAire's management about the problem, rather than involving management from the host location. Crabtree states in his declaration that this incident could have caused significant problems between IdleAire and Petro's. [Id.].

The plaintiff, on the other hand, denies that this incident occurred. She testified that she was not there while the employees were changing clothes and that she was not even aware of the incident until after her termination. [Avery Dep. at 206]. Baker confirms the plaintiff's version of events, testifying that she was the one who complained to David Everhart about the two IdleAire employees changing in the bathroom, and that she told her supervisor at Petro's that the plaintiff had nothing to do with her making the complaint. [Baker Aff. at ¶¶5, 7].

A third reason given for the plaintiff's termination was the plaintiff's possession and distribution of confidential company documents, namely an offer letter from IdleAire to Mike Goodwin ("Goodwin"), a salesperson in the Fleet Sales Department. When Goodwin trained at the Watt Road location, he brought a work file which contained, among other things, his offer letter from IdleAire outlining the confidential terms and conditions of his employment, including his salary. Due to his position and the nature of his job responsibilities, Goodwin's salary was higher than the Site Representatives and Shift Leaders at the Watt Road location. When Goodwin finished his training and prepared to return to his office at IdleAire's corporate headquarters, he discovered that the offer letter was missing. [Goodwin Dec. at ¶4].

Lisa Hill ("Hill"), an IdleAire Shift Leader, maintained a file folder containing documents related to her employment at IdleAire, including evidence of pornography being viewed by IdleAire employees and documents related to safety issues. In August 2003, Hill provided the plaintiff with her file after she learned that Avery had called to make an appointment with David

Everhart to complain about the pornography on the company computer. While looking through the file folder's contents, Avery came across Goodwin's original offer letter and asked Hill where she had obtained it. Hill responded, "Well, he's dumb enough to leave [it] on a desk." [Avery Dep. at 187]. Karen Stilwell-Clemons walked into the office while Hill and the plaintiff were discussing and reviewing the contents of Hill's file. Stilwell-Clemons, who was aware that Goodwin's offer letter had been missing for sometime, asked the plaintiff if she could make a copy of the letter because she thought that the chief executive officer of the company "needs to see that this is going around at Watt Road." [Stilwell-Clemons Dep. at 74]. The plaintiff subsequently provided a copy of Goodwin's offer letter to Stilwell-Clemons, who sealed it in an envelope and gave it to her husband, Paul Clemmons (also an IdleAire employee), to deliver it to the chief executive officer. [Id.].

Avery took Hill's file, including Goodwin's offer letter, to IdleAire's facility in North Knoxville to make copies of the documents in anticipation of meeting with Everhart. [Avery Dep. at 189-90].[4] When she arrived there, Paul Clemons let her into the locked facility and allowed her to copy the contents of Hill's file. Paul Clemons was aware that the Goodwin offer letter was in the file because his wife had called earlier (after she had copied the document herself) to let him know that the plaintiff was coming over to copy the file. [Avery Dep. at 189]. Avery testified that she did not distribute or show any of the documents in Hill's file to any employees at the North Knoxville facility. [Id. at 191].

---

[4]Avery testified that she copied the Goodwin offer letter "to show the lack of privacy" at the Watt Road location. [Avery Dep. at 197].

The plaintiff testified that she was subsequently contacted by an IdleAire manager, Marty Clemmons, who told her that she needed to get the offer letter back to Goodwin. Within a day or so of copying the offer letter, the plaintiff contacted Goodwin and offered to return the letter to him. [Avery Dep. at 194, 196].

On September 7, 2003, the plaintiff sent an email to Hunt and Buzbee, requesting to meet with them as soon as possible to discuss her concerns about the ongoing pornography on the company computer. [Avery Dep. Ex. 13]. Later that day, the plaintiff met with Hunt and Patterson. [Avery Dep. at 107, 201, Ex. 18]. The plaintiff discussed her concerns about the pornographic material on the company's computer and advised them that it had not stopped and was getting worse. She provided a copy of her file showing the history of pornographic websites that had been visited. Hunt looked through the printouts, said, "Well, this is history," and handed it back to the plaintiff. [Avery Dep. at 201-02]. During this meeting, the plaintiff was questioned about the Goodwin offer letter. At the end of the meeting, the plaintiff was suspended for seven days while IdleAire continued to investigate the matter.

Subsequently, Stilwell-Clemons met with Hunt and Patterson, who asked her where the plaintiff had obtained the Goodwin offer letter. Stilwell-Clemons told them that it came from Lisa Hill's file. Hunt then asked her, "Are you sure that it was not Sharon that had it?" Stilwell-Clemons again stated that the letter came from Hill's folder originally. The next day, Stilwell-Clemons met with Hunt and Patterson again. They told her that they "wanted to make sure that [they] understood her correctly, that it was Lisa's file that the offer letter came out of, [that] they might have misunderstood and it [in fact] came from Sharon." Stilwell-Clemons testified that she believed Hunt and Patterson were repeatedly questioning her about this incident to imply that she

should change her story and tell them that the offer letter came from the plaintiff. Stilwell-Clemons again told them that Hill originally had the offer letter, and that she had obtained it from Hill's file. Stilwell-Clemons was never disciplined for copying the Goodwin offer letter or showing it to other employees. [Stilwell-Clemons Dep. at 78-82].

Hunt and Patterson also asked Paul Clemons about the Goodwin letter incident. Clemons was adamant that the plaintiff did not pass out any confidential documents at the North Knoxville facility, and that the copy of the offer letter that he had received came from his wife and not the plaintiff. [Clemons Dep. at 23-25].

Patterson states in his declaration that he learned that the plaintiff had made photocopies of the offer letter and had distributed the letter to other co-employees. Patterson further states that he instructed Avery to return Goodwin's offer letter to Patterson but that the plaintiff did not do so, instead meeting with Goodwin and giving the letter directly to him. According to Patterson, the plaintiff's actions were in violation of company policies. [Patterson Dec. at ¶¶16-17].

After IdleAire completed its investigation, the plaintiff was terminated. [Avery Dep. Ex. 18]. The stated reasons for the plaintiff's termination were as follows:

1.     Persistent dissatisfaction with the terms and conditions of her employment, including the hourly wage being paid for her position, leading to an extremely negative attitude which was conveyed to other employees at Watt Road, leading other employees to unfairly question their positions;

2.     Inability to lead site representatives without alienating shift workers, resulting in a significant loss of morale;

3.     Inappropriate conduct involving an employee of Petro, resulting in a potentially embarrassing situation between the company and one of its major clients;

4.     Expressing job-related concerns to fellow employees, rather than discussing such subjects with her immediate supervisors, as is required by company policy;

5. Being improperly in possession of confidential company information, and thereafter making improper use of the information, including discussing confidential compensation information with other employees.

6. These various facts and considerations constitute violations of Section 112 and Section 701 of the company Employee Handbook.

[Avery Dep. Ex. 18].


## III.   The Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of establishing that there is no genuine issue of material fact lies upon the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In considering a motion for summary judgment, the Court must take all of the evidence submitted by the non-moving party as true, and must draw all reasonable inferences in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. Id. at 248. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. Id.

Once the moving party presents evidence sufficient to carry its burden under Rule 56, the non-moving party may not rest upon its pleadings, but must affirmatively set forth, by affidavits or otherwise, "specific facts showing that there is a genuine issue for trial." Fed. R. Civ.

P. 56(e). An entry of summary judgment is mandated if, "after adequate time for discovery and upon motion, [the non-moving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In reviewing the evidence, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52; see also Gaines v. Runyon, 107 F.3d 1171, 1174-75 (6th Cir. 1997) (requiring non-moving party "to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial" in order to defeat summary judgment).

IV.     **Analysis and Ruling**

    A.     **Failure to Promote**

        The plaintiff alleges that IdleAire discriminated against her in violation of Title VII and the ADEA when it failed to promote her to the Site Supervisor position and the Texas Area Sales Manager position.

        Because the plaintiff does not purport to present any direct evidence of discrimination, the Court will analyze her claims under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The Court analyzes an age discrimination claim under the same framework as a gender discrimination claim under Title VII. Grosjean v. First Energy Corp., 349 F.3d 332, 335 (6th Cir. 2003). Thus, in order to establish a discrimination claim based on a failure to promote, the plaintiff must demonstrate (1) that she is a member of the protected class, that is, that she is at least forty years of age and female; (2) that she applied for and

was qualified for a promotion; (3) that she was considered for and denied the promotion; and (4) that an individual outside the protected class with similar qualifications received the promotion instead. White v. Columbus Metro. Housing Auth., 429 F.3d 232, 240 (6th Cir. 2005) (Title VII claim); Anthony v. BTR Automotive Sealing Systems, Inc., 339 F.3d 506, 515 (6th Cir. 2003) (ADEA claim).

Once the plaintiff has made out a *prima facie* case, the burden shifts to the defendant to give a legitimate, non-discriminatory reason for the challenged action. See White, 429 F.3d at 244; Anthony, 339 F.3d at 516. If the defendant satisfies this burden, the burden shifts back to the plaintiff to show that the legitimate reasons offered were merely pretext for discrimination. White, 429 F.3d at 245; Anthony, 339 F.3d at 516. "Pretext may be shown 'either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1082 (6th Cir. 1994) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)). A plaintiff may demonstrate pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 576 (6th Cir. 2003) (quoting Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000)).

1.      **Site Supervisor Position**

For the purposes of this motion, the defendant does not dispute that the plaintiff satisfied the first three elements of a prima facie case with respect to the Site Supervisor position.

The defendant does dispute, however, that the plaintiff has shown that the employee who did receive the promotion was "similarly situated" to the plaintiff.

In order to satisfy the fourth element of the prima facie case, the plaintiff must show "that she and the non-protected person who ultimately was hired for the desired position had similar qualifications." White, 429 F.3d at 242. The Court agrees with the defendant that the undisputed facts show that the plaintiff and Patterson did not possess similar qualifications. First, Patterson was a full-time employee, whereas the plaintiff was only a part-time employee at the time that she applied for the Site Supervisor position. See Asher v. Riser Foods, Inc., No. 92-3357, 1993 WL 94305, at *3 (6th Cir. Mar. 30, 1993) (finding part-time female employee was not "similarly situated" to full-time male employees for purposes of Title VII discrimination claim). Second, the Court finds that Patterson had more supervisory and managerial experience than the plaintiff. While the plaintiff had previously owned businesses with her husband and had experience as an over-the-road truck driver, a secretary, an EEO officer, and a payroll officer, there is no evidence in the record to indicate that she had experience specifically supervising and/or managing employees. By contrast, Patterson had worked as an Area Manager for U.S. Cellular for approximately one year, a store manager for Dick's Sporting Goods for approximately one year, and as a manager for Toys R Us/Babies R Us in California and other states for seven years. While he worked at IdleAire, Patterson worked as a Site Representative and as a fill-in Shift Leader, primarily during the busiest shift. Because Patterson clearly had more supervisory experience than the plaintiff, the Court cannot say that these two applicants were "similarly situated" with respect to their qualifications. See Hale v. Cuyahoga Co. Welfare Dep't, 891 F.2d 604, 606 (6th Cir. 1989) (finding that the successful applicant's "extensive supervisory experience" was a legitimate basis

for promotion which plaintiff could not rebut); <u>Grayson v. City of Chicago</u>, 317 F.3d 745, 749 (7th Cir. 2003) (finding plaintiff not "similarly situated" with successful applicant where plaintiff had not held "equivalently demanding positions").

Additionally, the Court notes that the plaintiff cannot establish a prima facie case of age discrimination because she cannot show that the recipient of the promotion was a substantially younger individual. In an age discrimination claim, the fourth element of the prima facie case is modified to require the plaintiff to show that the person selected outside the protected class was "significantly younger." <u>Grosjean</u>, 349 F.3d at 335. In the present case, Patterson is less than two years younger than the plaintiff. The Sixth Circuit has held that "in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." <u>Id.</u> at 340. For all of these reasons, the Court concludes that the plaintiff cannot make out a prima facie case of discrimination with respect to IdleAire's decision not to promote her to the Site Supervisor position.

Even if the plaintiff could establish a prima facie case of gender or age discrimination, the Court finds that IdleAire has set forth a legitimate, non-discriminatory reason for promoting Patterson over the plaintiff. According to Gerry Cooksey, IdleAire's Director of Training, Patterson's interview performance, past work experience, and performance with IdleAire were deemed the best of all the applicants who applied for the position. Patterson was able to demonstrate an excellent knowledge of management, possessed better communication skills than the other applicants, and had impressive experience and qualifications related to the position. [Cooksey Dec. at ¶4]. Steve Hunt, IdleAire's Area Sales Manager, testified that he believed those traits to be essential to the Site Supervisor position. [Hunt Dec. at ¶7].

Because IdleAire has shown a legitimate basis for its decision, the burden shifts back to the plaintiff to demonstrate that IdleAire's proffered reason is pretextual. The Court finds that the plaintiff has not satisfied this burden. Even viewing all of the evidence in the light most favorable to the plaintiff, the Court finds that the plaintiff has not demonstrated that a discriminatory motive more likely motivated IdleAire's decision, nor has the plaintiff shown that IdleAire's reason for selecting Patterson for the Site Supervisor position had no basis in fact, did not actually motivate the decision, or was insufficient to justify the decision. See Wexler, 317 F.3d at 576. Accordingly, the plaintiff's failure to promote claim with respect to the Site Supervisor position must fail.

### 2. Area Sales Manager Position

For the purposes of this motion, the defendant does not dispute that the plaintiff was a member of a protected class by virtue of her age and gender, that she was qualified for the position of Area Sales Manager, that she was denied the promotion, and that the person selected for the promotion, James Abernathy, was a substantially younger male. The defendant takes issue, however, with the plaintiff's contention that she was similarly situated to Abernathy with respect to qualifications for the promotion.

At the time that she applied for the position of Texas Area Sales Manager, the plaintiff was employed as a Shift Leader, a position two levels below an Area Sales Manager. [Patterson Dec. at ¶8]. By contrast, Abernathy was the Site Supervisor, a position one level above a Shift Leader and one level below an Area Sales Manager. Additionally, Abernathy was the Site Supervisor at IdleAire's Atlanta location, the highest grossing IdleAire facility at the time, when he applied for the position. In the plaintiff's opinion, her prior work experience was more relevant to the position of Area Sales Manager than Abernathy's. She further testified that in her view, there

26

was "not much" more responsibility associated with being a Site Supervisor as opposed to being a Site Representative. [Avery Dep. at 155-56]. The plaintiff's subjective belief, however, that she was more experienced or better qualified is not sufficient to establish a prima face case of discrimination. See Southmayd v. Apria Healthcare, Inc., 412 F. Supp. 2d 848, 857 (E.D. Tenn. 2006) (finding plaintiff's conclusory opinion that he was better qualified than other employees retained in a reduction in force to be insufficient to establish prima facie case of age discrimination). Rather, "it is the manager's motivation that is the key factor, not the employee's perception or even the perception of his co-workers about the employee's abilities or skills." Shapira v. Lockheed Martin Corp., 88 F. Supp. 2d 813, 829 (E.D. Tenn. 1998). In the present case, Gerry Cooksey, one of the two decisionmakers with respect to the Area Sales Manager promotion, testified that Abernathy's leadership and management skills were considered instrumental in the success and profitability of the Atlanta location that he managed. [Cooksey Dec. at ¶6]. Based upon this evidence, the Court concludes that the plaintiff and Abernathy were not similarly situated employees.

Even if the plaintiff could make out a prima facie case of discrimination, the Court finds that IdleAire has set forth a legitimate reason for promoting Abernathy to the Area Sales Manager position. Specifically, Cooksey testified that Abernathy's experience, the success of the Atlanta location, his experience in managing new sites, and his interview performance led the decisionmakers to conclude that he was the best choice for the position. [Id.].

The plaintiff argues that IdleAire's proffered reason is pretextual, as evidenced by the fact that (1) Patterson had told her, prior to applications being accepted in September, that James Abernathy would be the one to get the Texas position and (2) when the plaintiff applied for the Area

Sales Manager position, Patterson made fun of her resume and her attempt at promotion in front of other employees. Neither of these facts, however, establish pretext. It is undisputed that Buzbee and Cooksey were the decisionmakers responsible for selecting the successful candidate for the Texas Area Sales Manager position. [Cooksey Dec. at ¶5]. "'[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [can not] suffice to satisfy the plaintiff's burden . . .' of demonstrating animus." Bush v. Dictaphone Corp., 161 F.3d 363, 369 (6th Cir. 1998) (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)); see also Wells v. New Cherokee Corp., 58 F.3d 233, 238 (6th Cir. 1995) (considering discriminatory comments of supervisor who had "contributed significantly" to the termination decision). In the present case, there is no evidence in the record to support a finding that Patterson was a decisionmaker with respect to the Area Sales Manager position. While the plaintiff testified that she expected Buzbee and Cooksey to seek input from Patterson regarding the plaintiff's qualifications and past work performance in the process of considering her for the position, [Avery Dep. at 157], there is no evidence in the record that Buzbee and Cooksey sought such input or that Patterson in fact provided any such input into the decisionmaking process. For these reasons, the Court finds that the plaintiff has failed to demonstrate pretext with respect to IdleAire's decision to hire Abernathy for the Texas Area Sales Manager position, and therefore, her failure to promote claim must be dismissed.

## B.     Hostile Work Environment

Next, the plaintiff asserts that she was subjected to a hostile work environment in violation of Title VII. The defendant counters that the conduct of which the plaintiff complains was not sufficiently severe or pervasive to the rise to the level of a hostile working environment.

Further, the defendant contends that the plaintiff's hostile work environment claim must be dismissed because (1) the plaintiff unreasonably failed to report the harassing behavior as required by the employee handbook and (2) the Communications Decency Act bars the plaintiff's claims.

Title VII of the Civil Rights Act of 1964 provides, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer . . . to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has held that this provision "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment.'" Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 78 (1998) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted).

In order to prove a hostile work environment claim, the plaintiff must demonstrate that (1) she is a member of a protected class; (2) she was subjected to unwelcomed sexual harassment; (3) the harassment was based on her sex; (4) the harassment created a hostile work environment; and (5) the employer is vicariously liable. Williams v. Gen. Motors Corp., 187 F.3d 553, 560-61 (6th Cir. 1999). There are different standards for evaluating whether the employer is vicariously liable for the hostile work environment, depending upon whether the alleged harasser is the victim's co-worker or the victim's supervisor. Clark v. United Parcel Service, Inc., 400 F.3d

341, 348 (6th Cir. 2005). In the case of co-worker harassment, the plaintiff must show that the employer knew or reasonably should have known about the harassment but failed to take adequate remedial action before liability can be imposed. Id. In the case of supervisor harassment, the employer is automatically liable if the supervisor engaged in harassing conduct that resulted in a tangible employment action. Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).

To show a hostile work environment, the plaintiff must meet both an objective and a subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." Bowman v. Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000). In determining whether the alleged harassment is sufficiently severe or pervasive, the Court must consider the totality of the circumstances. Williams, 187 F.3d at 562. Among the appropriate factors the Court may consider is "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. "[T]he issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether – taken together – the reported incidents make out such a case." Williams, 187 F.3d at 562. Mere isolated incidents, "unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment." Bowman, 220 F.3d at 463.

The standards for determining the existence of a hostile work environment "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Faragher, 524 U.S. 788. Accordingly, "the ordinary tribulations of the workplace, the sporadic use of abusive

language, gender-related jokes, and occasional teasing" do not rise to the level of severe and pervasive conduct creating a hostile environment.  Id.  "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . sex." Oncale, 523 U.S. at 80.  Thus, conduct that is not sexual in nature may be illegally sex-based and thus considered in the hostile environment analysis only if the employee can show that but for her gender, she would not been subjected to the harassment.  Bowman, 220 F.3d at 463.

IdleAire argues that the incidents cited by the plaintiff are simply isolated incidents of off-hand remarks and teasing which are not sufficient to create a hostile work environment.  It further contends that while Patterson did make a joke about the plaintiff's resume, he was verbally reprimanded for his conduct.  With respect to the alleged harassment by co-workers, IdleAire argues that there is no proof that the pornography on the company computer was directed at the plaintiff or that she was subjected to it because of her gender.  IdleAire further argues that there is no proof that the pornography was either subjectively or objectively offensive to the plaintiff, as there is evidence that she showed the pornographic images that she printed from the computer to her mother and a friend and that she reviewed the images multiple times herself.  IdleAire contends that the plaintiff's exposure to the pornography was minimal, as the pop-ups were on the screen only for a few seconds.  IdleAire contends that the plaintiff voluntarily subjected herself to the most egregious of the pornography by viewing the internet history and pulling up the pornographic websites herself.  Finally, IdleAire argues that there is no evidence that the plaintiff's work was affected by this alleged harassment.

It is undisputed that the plaintiff was a member of a protected class and therefore satisfies the first element of a hostile work environment claim.  With respect to the second element,

the Court finds that the plaintiff has provided sufficient evidence from which a jury could conclude that the alleged harassment was unwelcome. Next, the Court must consider whether the plaintiff was subjected to the alleged harassment because of sex and whether the harassment created a hostile work environment. IdleAire contends that the plaintiff cannot prove that the pornography on the company was directed to her or because of her gender. However, other courts have found that pornography displayed in the workplace, even if not directed to one individual specifically, may contribute to a hostile work environment for women generally. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1479 (3d Cir. 1990) (finding supervisor liable for permitting employees to display excessively lewd pictures); Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486, 1523 (M.D. Fla. 1991) (finding plaintiff had demonstrated "severe and pervasive" harassment amounting to hostile work environment with evidence of comments and pictures displayed at workplace); Ayres v. Brewer Co., No. 1:04-cv-512, 2006 WL 2092559, at *4 (S.D. Ohio July 26, 2006) (finding question of fact presented where, among other things, company truck contained pornographic magazines); Bell v. Best Brands, Inc., No. 3:04-cv-0816, 2005 WL 2177007, at *10 (M.D. Tenn. Sep. 8, 2005) (finding evidence that workplace was "replete with instances of pornographic videos being shown," among other things, created question of fact as to whether plaintiff was subject to hostile work environment).

While admittedly some of the other incidents complained of by the plaintiff may not, standing alone, create a hostile work environment, viewing all of the incidents as a whole, the Court finds that a reasonable jury could conclude that the plaintiff was subjected to a hostile work environment. There is evidence from several witnesses that IdleAire management (including Hunt and Patterson) referred to the plaintiff as a "bitch," a "slut," and a "broad"; that management made

comments to the effect that the plaintiff could make more money as a prostitute; that management ridiculed her make-up, hair, and perfume; and that management made derogatory comments about her education and attempts at promotion. Additionally, there is ample testimony that IdleAire management were aware that pornography was being viewed in the workplace and that employees, including the plaintiff, were being unwillingly subjected to it. While IdleAire argues that the plaintiff voluntarily subjected herself to the most egregious of this pornography (by visiting the websites listed in the internet history of the computer), a reasonable jury could conclude that the plaintiff did so because she knew employees were viewing pornography using company resources and wanted proof of such to take to upper management.

The plaintiff has presented evidence from which a jury could conclude that the harassment she experienced was objectively and subjectively offensive. The Court has reviewed the evidence presented by the plaintiff and finds that a jury could conclude that it is objectively offensive for a female employee to be exposed to pornographic pop-ups advertising "perverted teens" and other obscene material. A jury could also find that it is objectively offensive for a female employee to have to use a computer which contains images downloaded by other employees from websites such as "teenslutsgonewild.com" or "smutserver.com/hardcore/anal/anal/anal.jpg." A jury also could find it to be objectively offensive for an employer to permit employees to use a company computer terminal on company time to actively seek pornographic material, whether for sexual gratification, entertainment, or in the words of one of the plaintiff's co-workers, simply out of boredom, and for the evidence of this activity (printouts, internet history, etc.), to be left for the plaintiff and other employees to see.

The Court finds unpersuasive IdleAire's argument that the plaintiff did not find these images subjectively offensive. The plaintiff testified that she viewed the internet history and printed copies of the pornographic websites to use as evidence to higher management that employees were viewing pornography at the workplace. The plaintiff's deposition testimony also indicates that she showed these images to her friend and mother because she was disturbed by the images and did not know what to do about them. Finally, the Court rejects the defendant's suggestion that the plaintiff was not offended by these images, because she reviewed them multiple times in preparing for this litigation. To give force to such an argument would have a strong, chilling effect on a plaintiff's ability to prepare a claim for presentation to a court or jury.

Finally, the Court finds that the plaintiff has presented evidence that the harassment interfered with her ability to perform her job. She testified that she suffered physically as a result of her employment with IdleAire, experiencing weight loss, hair loss, and problems with short-term memory and concentration. Other employees testified as well that the pornography interfered with their ability to perform their jobs. Thus, a jury question is also presented on this issue.

IdleAire asserts two defenses to the plaintiff's hostile work environment claim. First, IdleAire contends that the plaintiff's hostile work environment claim must be dismissed because the plaintiff unreasonably failed to report the harassing behavior as required by the employee handbook. Second, IdleAire argues that the Communications Decency Act bars the plaintiff's claims. The Court will address each of these defenses in turn.

An affirmative defense is available to employers in cases where the supervisor harassment did not result in a negative tangible employment action, such as a demotion, transfer or termination. In order to assert this affirmative defense, an employer must prove by a preponderance

of the evidence that "(a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provider by the employer or to avoid harm otherwise." Clark, 400 F.3d at 348 (quoting Faragher, 524 U.S. at 807-08).

In the present case, IdleAire contends that this affirmative defense is applicable and should preclude the imposition of liability for any alleged harassment of the plaintiff by her supervisors. Specifically, IdleAire argues that it exercised reasonable care to prevent and correct promptly any harassing behavior by implementing a sexual harassment policy and publicizing the policy to its employees. Further, IdleAire argues that the plaintiff unreasonably failed to complain about the alleged harassment to IdleAire's General Counsel, as required by the company's sexual harassment policy.

The Court finds that there are genuine issues of material fact as to whether the first prong of the affirmative defense is satisfied in this case. While the implementation of a sexual harassment policy is one factor to be considered in determining whether an employer acted reasonably in preventing and correcting sexually harassing behavior, the employer's "duty does not end there." Clark, 400 F.3d at 349. "Prong one of the affirmative defense requires an inquiry that looks behind the face of a policy to determine whether the policy was effective *in practice* in reasonably preventing and correcting any harassing behavior." Id. (emphasis added). The plaintiff has presented evidence from which a reasonable jury could conclude that, despite numerous complaints by the plaintiff and other employees about pornography and other inappropriate conduct in the workplace, IdleAire failed to exercise reasonable care to prevent and promptly correct this sexually harassing behavior.

Furthermore, the Court finds that a jury question is presented as to whether the plaintiff acted unreasonably in failing to comply with the company's complaint procedure. The employee handbook states that any sexually harassing conduct should be reported to the employee's supervisor, and that if the supervisor is unavailable or the employee believes that it would be inappropriate to contact the supervisor, the employee is to contact IdleAire's General Counsel. When asked why she did not report the instances of sexually harassing conduct to the General Counsel, the plaintiff testified that it was her understanding from Hunt and Patterson that IdleAire employees were not to call the General Counsel for any reason. She further testified that there was an "intimidation factor" which led her to believe that complaining about such conduct "was not good" in the eyes of management. [Avery Dep. at 125-26]. Based upon this testimony, a reasonable jury could conclude that the plaintiff did not act unreasonably in failing to report the alleged harassment by her supervisors. Accordingly, the Court finds that IdleAire is not entitled to summary judgment based upon this affirmative defense.

Next, the defendant argues that the plaintiff's claim is barred by the Communications Decency Act, which states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). An "information content provider" is defined by the Act as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). The term "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer

server, including specifically a service or system that provides access to the Internet . . . ."  47 U.S.C. § 230(f)(2).

IdleAire argues that "by its own terms, the section prohibits any federal or state claim that seeks to hold an employer that provides computer systems to its employees for use on the job from being held liable based upon the content of the information 'provided by another information content provider.'" [Doc. 81 at 40].  The defendant cites no authority for this proposition, and the Court is not aware of any such authority.  Indeed, the Court is not aware of any federal case in the country that has applied this Act in such a manner, and the Court declines to do so now.

For the foregoing reasons, the Court finds that there are genuine issues of material fact as to whether the plaintiff was subjected to a hostile work environment in violation of Title VII, and further, that there are genuine issues of material fact as to whether IdleAire may assert as an affirmative defense that the plaintiff unreasonably failed to pursue the proper channels to address the alleged harassment.  Accordingly, the defendant's motion for summary judgment with respect to this claim will be denied.

## C.     Unlawful Termination

The plaintiff claims that she was wrongfully terminated from IdleAire because of her age, her gender, and/or in retaliation for complaining about unlawful harassment.  IdleAire contends, on the other hand, that the plaintiff was lawfully terminated based on her own misconduct and problems with her co-workers, not because of her age or gender or because of any complaints that she made.

### 1.     Gender and Age Discrimination

Because the plaintiff does not contend to have any direct evidence of age or gender

discrimination, the Court must analyze her claims using the <u>McDonnell Douglas</u> factors. To establish a prima facie case of gender or age discrimination, the plaintiff must show (1) that she is a member of the protected class; (2) that she was subjected to an adverse employment action; (3) that she was qualified; and (4) she was replaced by a person outside of the protected class or that she was treated differently than similarly-situated employees outside of the protected class for the same or similar conduct. <u>McClain v. Northwest Community Corrections Center Judicial Corrections Bd.</u>, 440 F.3d 320, 332 (6th Cir. 2006); <u>Grosjean</u>, 349 F.3d at 335 (analyzing ADEA claims under same factors as Title VII).[5] If the plaintiff makes this showing, the burden then shifts to IdleAire to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. If IdleAire satisfies this burden, the plaintiff must produce evidence from which a jury could find that IdleAire's proffered reason is "merely pretextual." <u>McClain</u>, 440 F.3d at 332.

Upon carefully reviewing the evidence, the Court concludes that the plaintiff cannot make a prima facie showing of age or gender discrimination. While there is no dispute that the plaintiff satisfies the first three required elements, there is no evidence in this record to indicate that the plaintiff was replaced by a male employee or a younger employee. Furthermore, there is no evidence that similarly-situated employees outside of the protected were treated differently for similar conduct. The plaintiff argues in her brief that she meets this element by having shown that the other employees involved in the Goodwin offer letter incident were not discharged for their involvement. However, the evidence shows that the other two female employees involved, Lisa Hill

---

[5]In her brief, the plaintiff incorrectly asserts that the fourth element of the prima facie case is that the plaintiff show that she was terminated "under circumstances giving rise to an inference of discrimination or retaliation." However, this is not the standard set forth in the Supreme Court case cited by the plaintiff, <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993), nor is it the standard in the Sixth Circuit.

and Karen Stilwell-Clemons, are not substantially younger than the plaintiff: Stilwell-Clemons is, in fact, older than the plaintiff, and Lisa Hill is less than three years younger than her, which is not a "significant difference" for the purpose of an age discrimination claim. <u>See</u> <u>Grosjean</u>, 349 F.3d at 340. With respect to the other employee involved, Paul Clemons, the Court finds that he did not engage in the same or similar alleged conduct. Clemons was provided a copy of the Goodwin offer letter by his wife, and he delivered it to the chief executive officer of the company. The plaintiff, on the other hand, was accused (rightly or wrongly) of copying and distributing the Goodwin offer letter among IdleAire employees, which is substantially different conduct than bringing the letter to the attention of the head of the company. In any event, the plaintiff fails to cite to any evidence in the record indicating that Paul Clemons was not disciplined for this conduct. For these reasons, the Court finds that the plaintiff's age and gender discrimination claims arising out of her termination must fail.

### 2. Retaliation

To establish a prima facie case of retaliation, a plaintiff must show "(1) that the plaintiff engaged in a protected activity; (2) that the defendant had knowledge of the plaintiff's protected conduct; (3) that the defendant took an adverse employment action towards the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." <u>Weigel v. Baptist Hosp.</u>, 302 F.3d 367, 381 (6th Cir. 2002). In order to demonstrate a causal connection, "'a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken' in the absence of the protected conduct." <u>Id.</u> (quoting <u>Nguyen v. City of Cleveland</u>, 229 F.3d 559, 563 (6th Cir. 2000)).

The defendant argues that even if the plaintiff satisfied the first three elements of a *prima facie* case, she cannot show that there was a causal connection between the protected activity and her termination. The Court disagrees. The plaintiff has presented evidence from which a reasonable jury could conclude that the plaintiff was retaliated against for complaining about the alleged discrimination. The plaintiff met with Hunt and Patterson to voice her concerns, including her concerns about the pornography on the company computer. By the end of this meeting, Hunt and Patterson suspended the plaintiff, and she was terminated one week later.

The Sixth Circuit has held that "[a] causal link may be shown through knowledge combined with closeness in time." Weigel, 302 F.3d at 381 (quoting Johnson v. Univ. of Cincinnati, 215 F.3d 561, 582 (6th Cir. 2000)). The evidence in this case indicates that Hunt and Patterson made the decision to terminate the plaintiff shortly after she confronted them with her complaints of harassment. This closeness in time, coupled with the knowledge of the decisionmakers of her complaints, is sufficient in the Court's view to at least create a fact question for the jury. Accordingly, the Court finds that the plaintiff has made a prima facie showing of retaliation.

Moreover, while IdleAire offers numerous non-discriminatory reasons for the plaintiff's discharge, the Court finds that the plaintiff has shown additional evidence from which a jury could conclude that the reasons proffered by IdleAire for her termination were pretextual. With respect to the incident regarding the plaintiff's alleged complaint to Petro's management about two IdleAire employees changing clothes in the Petro's bathroom, the plaintiff has presented evidence (by way of her own testimony and that of Petro's assistant manager Lydia Baker), that the plaintiff did not know about this incident, much less make any type of complaint to Petro's, until after her termination. With respect to the Goodwin offer letter, there is ample evidence in the record from

which a jury could conclude that IdleAire management knew that the plaintiff was not the one who originally had the Goodwin offer letter and furthermore that she did not distribute it to other employees as alleged. At the least, a jury question is presented on whether these grounds for termination had any bases in fact. Accordingly, summary judgment must be denied as to the plaintiff's retaliation claim.

**D.      Equal Pay Act Violation**

The plaintiff alleges in her Complaint [Doc. 1] that she was paid less than her male counterparts in violation of the Equal Pay Act, 29 U.S.C. § 206(d). At oral argument on the summary judgment motion, the plaintiff conceded that she cannot proceed on this claim and that it should be withdrawn. Accordingly, the plaintiff's claim under the Equal Pay Act is hereby dismissed.

**E.      State Law Claims**

Finally, the plaintiff asserts that the defendant's conduct in discriminating against her and in creating a hostile work environment constituted outrageous conduct under Tennessee law. She further alleges that the defendant negligently inflicted severe emotional distress on the plaintiff. [Doc. 1].

To state a claim for outrageous conduct, a plaintiff must establish the following: "(1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was so outrageous that it cannot be tolerated by civilized society; and (3) the defendant's conduct resulted in serious mental injury to the plaintiff." Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 51 (Tenn. 2004). It is not enough to show that the defendant acted with tortious or criminal intent; the plaintiff must "show that the defendant's conduct was 'so outrageous in character, and so extreme in degree, as

to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  Id. (quoting Miller v. Willbanks, 8 S.W.3d 607, 614 (Tenn. 1999)).

        With respect to a claim for negligent infliction of emotional distress, the Tennessee Supreme Court has held that in order to avoid summary judgment, a "plaintiff must present material evidence as to each of the five elements of general negligence – duty, breach of duty, injury or loss, causation in fact, and proximate, or legal, cause."  Camper v. Minor, 915 S.W.2d 437, 446 (Tenn. 1996).  Additionally, the Tennessee Supreme Court requires that the plaintiff suffer a "serious" or "severe" emotional injury, the existence of which must be proven "by expert medical or scientific proof."  Id.

        Even taking all of the plaintiff's allegations as true, the Court does not find that either the plaintiff's termination or the work environment to which she was subjected rises to the level of "atrocious" or "utterly intolerable" conduct so as to give rise to a claim for outrageous conduct. Furthermore, the plaintiff has not presented any expert medical or scientific proof in support of her claim for negligent infliction of emotional distress.  For these reasons, the Court must dismiss the plaintiff's state law claims.

**V.**          <u>**Conclusion**</u>

For the reasons set forth above, and based upon the entire record in this case, the

defendant's Motion for Summary Judgment [Doc. 80] is **GRANTED IN PART** and **DENIED IN**

**PART**.

**ORDER TO FOLLOW.**

**ENTER:**

_____s/ H. Bruce Guyton_____
United States Magistrate Judge